UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| AYERS OIL CO.,                ) | |
|                         ) | |
|         Plaintiff,        ) | |
|                         ) | |
|         v.                ) | No. 2:09 CV 02 DDN |
|                         ) | |
| AMERICAN BUSINESS BROKERS, INC.   ) | |
|                         ) | |
|         Defendant and     ) | |
|         Third Party Plaintiff,   ) | |
|                         ) | |
|         v.                ) | |
|                         ) | |
| ROBERT AYERS and STEVE AYERS,    ) | |
|                         ) | |
|         Third Party Defendants.   ) | |
|                         ) | |

## MEMORANDUM AND ORDER

This action is before the court on the motions of defendant
American Business Brokers, Inc. to exclude expert witness Kevin Short
(Doc. 72) and for summary judgment (Doc. 74), and the motions of
plaintiff Ayers Oil Co. and third-party defendants Robert and Steve
Ayers to exclude the expert testimony of Paul Surls (Doc. 76) and for
summary judgment (Doc. 78.).  The parties have consented to the exercise
of plenary authority by the undersigned United States Magistrate Judge
pursuant to 28 U.S.C. § 636(c).  (Doc. 21.)

## I.  BACKGROUND

On December 31, 2008, plaintiff, Ayers Oil Co., brought this action
for a declaratory judgment in the Circuit Court of Marion County against
American Business Brokers, Inc. (ABB).  (Doc. 1 at 1.)  On January 12,
2009, ABB removed the action to this court, invoking diversity of
citizenship subject matter jurisdiction under 28 U.S.C. § 1332(a) and
28 U.S.C. § 1441(a).  (Id.)  On April 20, 2009, Ayers Oil filed an
amended complaint.  (Doc. 32.)  In Count I of its first amended
complaint, Ayers Oil seeks a declaratory judgment, declaring that the
Exclusive Listing Agreement between it and ABB terminated on February
12, 2008, and that it does not owe ABB any commission.  (Id. at 6.)  In

Count II, Ayers Oil alleges ABB was negligent in giving advice relating to the brokerage agreement and failed to perform its obligations under the agreement. (Id. at ¶ 24.) Ayers Oil alleges it suffered $250,000 in damages as a proximate result of this negligence. (Id. at ¶ 27.)

On January 16, 2009, ABB filed a counterclaim against Ayers Oil. (Doc. 7.) In Count I of its counterclaim, ABB alleges that it had a brokerage agreement with Ayers Oil, by which it would receive a 4% commission for finding a willing buyer for Ayers Oil. (Id. at ¶ 18.) ABB alleges it found a buyer willing to purchase Ayers Oil for $19 million. (Id. at ¶ 22.) Alleging breach of the brokerage agreement, ABB alleges it has suffered $760,000 in damages. (Id. at ¶¶ 25-29.) In Count II of its counterclaim, ABB alleges an implied contract existed between the parties, and seeks to recover its $760,000 commission under a quantum meruit theory. (Id. at ¶¶ 30, 34.)

On January 16, 2009, ABB filed a third-party complaint against third-party defendants, Robert Ayers and his son, Steve Ayers. (Doc. 8.) In Count I of its third-party complaint, ABB alleges that it is entitled to receive its $760,000 commission from Robert and Steve Ayers. (Id. at ¶ 22.) In support of Count I, ABB alleges there was a mutual agreement between the parties, and that Robert and Steve Ayers breached this agreement. (Id. at ¶¶ 24, 28.) In Count II, ABB alleges an implied contract existed between the parties, and seeks to recover its commission under a quantum meruit theory. (Id. at ¶ 30.) In Count III, ABB alleges that Robert Ayers asked ABB to sell his stock in Illinois Ayers Oil Co. to prospective buyers, according to a stock sale agreement. (Id. at ¶¶ 8, 11.) ABB alleges that it found a buyer willing to purchase Robert Ayers's stock. (Id. at ¶¶ 13, 15.) Alleging breach of contract, ABB seeks to recover its commission under the stock sale agreement. (Id. at ¶¶ 24-25.) In Count IV, ABB alleges an implied contract existed between the parties, and seeks to recover its stock sale commission under a quantum meruit theory. (Id. at ¶ 26.)

On April 20, 2009, third-party defendants Robert and Steve Ayers filed a counterclaim against third-party plaintiff ABB. (Doc. 33.) In their counterclaim, the Ayers allege ABB was negligent in giving advice relating to the brokerage agreement and failed to perform its

obligations under the agreement.  (<u>Id.</u> at ¶ 10.)  They allege they suffered $250,000 in damages as a proximate result of ABB's negligence. (<u>Id.</u> at ¶ 13.)

## II.  EXPERT REPORT OF KEVIN SHORT

On November 9, 2009, Kevin Short prepared an expert report for Ayers Oil.  In the first section of his expert report, Short described the process that his firm would follow in representing a company that wished to be sold.  Under the competitive auction process, Short's firm would perform a pre-sale due-diligence analysis, identify a list of several hundred prospective buyers, and then contact the prospective buyers.  The prospective buyers would submit an "expression of interest", and the seller would attempt to reach an agreement with the buyer that submitted the expression of interest with the best terms. (Doc. 72, Ex. 1 at 1-2.)

In the second section of his report, Short stated that he would have placed a "very low probability" on the deal between Ayers Oil and Convenience Stores, LLC closing at the time the two parties executed the purchase agreement on August 25, 2008.  Short believed the probability was so low because the Purchase Agreement failed to include a mechanism for adjusting the purchase price pending the final sale, the buyer still needed to secure financing for the deal, a number of due diligence concerns remained unaddressed, and there were still issues surrounding the promissory note.  (<u>Id.</u> at 2-3.)

In the third section of his report, Short provided his interpretation of the phrase "Ready, Willing, and Able Buyer."  In his opinion, the phrase described a buyer that had signed a purchase agreement that did not contain any contingencies (such as concerns over financing or due diligence) and that possessed all of the cash required to close the deal.  (<u>Id.</u> at 3.)

In the fourth section of his report, Short explained the duties that a business broker owed its client.  A broker may not have a conflict of interest with the client, and must always advocate on behalf of the client.  Based on his reading of several ABB e-mails, Short believes ABB breached this duty.  (<u>Id.</u> at 3-6.)

### III.  MOTION TO EXCLUDE KEVIN SHORT

ABB moves to exclude the expert testimony of Kevin Short.  The company argues that Short is an investment banker, and that the role of an investment banker is very different from the role of a transaction broker.  It also argues that the investment banker arranges the sale of a business in a very different manner than that of a transaction broker.  As a result, ABB asserts that Short is not qualified to provide an opinion relating to the applicable standard of care.  It also asserts that Short's opinions represent speculation and improper legal conclusions, and would invade the province of the jury.  (Docs. 73, 86.)

In response, Ayers Oil and Robert and Steve Ayers argue that there is no substantive difference between the steps Kevin Short would take to sell a business, and the steps that a transaction broker would take.  In addition, Ayers Oil argues that Short's opinions do not call for speculation or improper legal conclusions.  (Doc. 84.)

### IV.  EXPERT REPORT OF PAUL SURLS

On July 17, 2009, Paul Surls prepared an expert report for ABB.  In preparing his report, Surls spoke with Terry Monroe, the President of ABB, reviewed the Transaction Broker Agreement, and reviewed other documents in the case.  In the first section of his expert report, Surls explained the three phases of the ownership transfer process undertaken by ABB.  As part of the first phase, ABB determined the seller's objectives, price, and terms, and prepared a package or profile to market the listing.  As part of the second phase, ABB screened potential buyers, and then delivered to Ayers Oil the purchase agreement of a prospective buyer.  As part of the third phase, ABB conducted the final discovery, due-diligence, and negotiations.  According to Surls, this third phase is the phase where sellers and buyers get nervous, and where potential deals might fall apart.  Surls concluded that ABB performed its duties in an ethical and professional manner at each phase of the process.  In his opinion, Ayers Oil's payment of $250,000 to the prospective buyer was an acknowledgment that the company failed to close

the deal.  Finally, Surls addressed several specific allegations found
in the complaint.  (Doc. 77, Ex. 1 at 1-6.)

### V.  MOTION TO EXCLUDE PAUL SURLS

Ayers Oil and Robert and Steve Ayers move to exclude the expert
testimony of Paul Surls.  Ayers Oil argues that Surls's proposed
opinions amount to legal conclusions, invade the province of the jury,
and are not based on any objective standard.  Ayers Oil notes that the
report includes several legal statements without any reference to a
legal citation.  (Docs. 77, 87.)

In response, ABB argues that Surls's proposed opinions are
admissible and helpful to the jury.  Count II of the complaint alleges
that ABB breached the standard of care, and ABB notes that Surls's
testimony speaks to this issue.  (Doc. 81.)

### VI.  DISCUSSION

**Admitting Expert Testimony**

In diversity cases, federal law governs the admissibility of expert
testimony.  Unrein v. Timesavers, Inc., 394 F.3d 1008, 1011 (8th Cir.
2005).  To be admissible, the proponent of the evidence must prove that
the expert testimony is both reliable and helpful, and that the expert
is qualified to be a witness.  Fed. R. Evid. 104(a); Fed. R. Evid. 702
advisory committee's note.  This showing must be made by a preponderance
of the evidence.  Bourjaily v. United States, 483 U.S. 171, 176 (1987).
Rule 702 of the Federal Rules of Evidence guides the court in
determining the admissibility of expert testimony.

Under Rule 702, the court must first find that scientific,
technical, or other specialized knowledge will assist the trier of fact
to understand the evidence or to determine a fact in issue.  Fed. R.
Evid. 702.  If the court makes this finding, a witness qualified as an
expert by knowledge, skill, experience, training, or education, may
testify in the form of an opinion, provided (1) the testimony is based
upon sufficient facts or data, (2) the testimony is the product of
reliable principles and methods, and (3) the witness has applied the
principles and methods reliably to the facts of the case.  Id.  An

expert must explain how he arrived at his or her conclusions; the trial court may not simply take the expert's word for it. Fed. R. Evid. 702 advisory committee's note; <u>Thomas v. City of Chattanooga</u>, 398 F.3d 426, 432 (6th Cir. 2005).

Rule 702 incorporates the rulings of the Supreme Court's decisions in <u>Kumho Tire</u> and <u>Daubert</u>. Fed. R. Evid. 702 advisory committee's note. In those cases, the Supreme Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony. <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 141 (1999); <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 597 (1993). In exercising this gatekeeping responsibility, the trial judge must follow the standards of Rule 702, but can also consider the four factors found in <u>Daubert</u>.[1] Fed. R. Evid. 702 advisory committee's note; <u>Kumho Tire</u>, 526 U.S. at 140-41 ("[T]he test of reliability is 'flexible,' and <u>Daubert's</u> list of specific factors neither necessarily nor exclusively applies to all experts or in every case."). Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony, and the rule remains one of admissibility rather than exclusion. <u>Shuck v. CNH Am., LLC</u>, 498 F.3d 868, 874 (8th Cir. 2007).

**Kevin Short's Testimony**

In his first opinion, Short described the process that is used to sell companies the size of Ayers Oil. There is no better test for "determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." <u>In re Blech Sec. Litig.</u>, No. 94

---

[1]In <u>Daubert</u>, the Supreme Court listed four non-exclusive factors for assessing the reliability of scientific expert testimony: (1) whether the expert's theory or technique can or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the technique has a known rate of error or standards controlling its operation; and (4) whether the theory enjoys general acceptance within the relevant scientific community. <u>Daubert</u>, 509 U.S. at 592-94.

Civ. 7696 RWS, 2003 WL 1610775, at *19 (S.D.N.Y. Mar. 26, 2003).  More
to the point, an expert may testify about the customs and standards of
an industry, and how a party's conduct compares to those standards.  <u>Id.</u>
In this case, the process of selling a multi-million dollar corporation
is outside the common knowledge of the average juror.  As a result,
expert testimony about this process would assist the jury in
understanding the evidence and determining the facts at issue.

Kevin Short has been an investment banker for twenty-five years,
and has spent nine of those years as the Managing Partner and CEO of a
middle market investment banking firm.  This experience qualifies Short
as an expert in the field.  <u>See id.</u> at *20 ("[T]he text of Rule 702
expressly contemplates that an expert may be qualified on the basis of
experience.").

The opinions in Short's expert report are based on his extensive
experience in the investment industry.  There is no indication that his
opinions are based on any objective testing or that they have been peer
reviewed.  However, the four <u>Daubert</u> factors cannot be applied to every
expert in every case.  <u>Kumho Tire</u>, 526 U.S. at 140-41.  In fact, in
certain fields, experience in the industry is the predominant, if not
the sole, basis for reliable expert testimony.  <u>Blech Sec. Litig.</u>, 2003
WL 1610775, at *20.  Under the circumstances, Short's first opinion is
sufficiently reliable.

In his second opinion, Short stated that there was a "very low
probability" that the deal between Ayers Oil and Convenience Stores, LLC
would close at the time the two parties executed the Purchase Agreement.
Short believed the probability was so low because the Purchase Agreement
failed to include a mechanism for adjusting the purchase price pending
the final sale, the buyer still needed to secure financing for the deal,
a number of due diligence concerns remained unaddressed, and there were
still issues surrounding the promissory note.  (Doc. 72, Ex. 1 at 2-3.)
This opinion is the product of Short's experience in the industry, and
is sufficiently reliable.

In his third opinion, Short provided his interpretation of the
phrase "Ready, Willing, and Able Buyer," found in the listing agreement.
The parties have not argued that this phrase is subject to different

definitions within the context of the contract at issue, and therefore is ambiguous. Nevertheless, because such business dealings as is before the court in this case is outside the common knowledge of the average juror, the meaning of this phrase in that context can be the subject of an expert's opinion even though it may involve an ultimate issue of fact. <u>Rottlund Co. v. Pinnacle Corp.</u>, 452 F.3d 726, 732 (8th Cir. 2006). Short may provide his interpretation of the phrase "Ready, Willing, and Able Buyer" at trial. However, he may not conclude that, in his opinion, Convenience Stores, LLC was not a ready, willing, and able buyer. Once the interpretation of the phrase is explained to the jury in the factual context of this case, to then state his ultimate conclusion that Convenience Stores was or was not such a buyer would invade the province of the jury to decide the issue. <u>Id.</u> He may not state such as a final conclusion.

In his fourth opinion, Short explained the duties that a business broker owes its client. When a plaintiff complains of professional negligence, expert testimony is often necessary to prove there was a breach of duty. <u>Parra v. Bldg. Erection Servs.</u>, 982 S.W.2d 278, 285 (Mo. Ct. App. 1998). In this case, Ayers Oil alleges that ABB was negligent in giving advice concerning the brokerage agreement. This type of allegation requires expert testimony to assist the jury in determining what duties ABB owed Ayers Oil, and what a reasonably careful broker would have done under similar circumstances. <u>See</u> <u>Warfield v. Stewart</u>, No. 2:07 CV 332 FTM-33SP, 2009 WL 2421594, at *3 (M.D. Fla. July 31, 2009) (allowing expert to testify concerning the standard of care for transactional real estate brokers); <u>see also</u> <u>Blech Sec. Litig.</u>, 2003 WL 1610775, at *21 (allowing the expert to testify about the scope of "ordinary broker activity," and about the customs and practices of the industry). Short may explain the duties that a business broker owes its client.

Short may also point to facts that indicate ABB breached a duty, but he may not <u>conclude</u> that ABB breached this duty. <u>See</u> <u>Sec. and Exch. Comm'n v. U.S. Envtl., Inc.</u>, No. 94 Civ. 6608 PKL-AJP, 2002 WL 31323832, at *4 (S.D.N.Y. Oct. 16, 2002). Under Rule 704, an expert can make factual conclusions that embrace an ultimate issue to be determined by

the jury, but the expert's testimony cannot state ultimate legal conclusions based on those facts. Id. For example, an expert can point to factors indicating that a defendant manipulated the market, but the expert cannot simply state that the defendant manipulated the market. Blech. Sec. Litig., 2003 WL 1610775, at *23. Short may not conclude that ABB breached any duty to Ayers Oil. See Williams v. Wal-Mart Stores, Inc., 922 F.2d 1357, 1360 (8th Cir. 1990) ("A trial court may, however, exclude opinion testimony if it is so couched in legal conclusions that it supplies the fact finder with no information other than what the witness believes the verdict should be.").

ABB argues that the role of an investment banker is different than the role of a transaction broker, and given that difference, Short's testimony would be unhelpful to the jury. The court disagrees. Short has extensive experience in the merger and acquisition field, and is qualified to discuss the merger process and the role of advisors in that process. (Doc. 72, Ex. 1 at 7.) The different roles and obligations of investment bankers and transaction brokers will be a matter for the jury to consider after cross-examination and the presentation of contrary evidence. See Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction of the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

The motion to exclude the expert testimony of Kevin Short is granted in part, and otherwise denied.

**Paul Surls's Testimony**

In his expert report, Paul Surls explained the three phases of the ownership transfer process undertaken by ABB. As noted above, the process of selling a multi-million dollar corporation is outside the common knowledge of the average juror. Expert testimony about this process would therefore assist the jury in understanding the evidence and determining the facts at issue.

Paul Surls is the President of Broadway Business Group, Inc., and is a member of several business brokers' associations. He has established business brokerage offices, and has worked with buyers and

sellers in the process involving the sale of a business. (Doc. 72, Ex. 3 at 8-9.) This experience qualifies Surls as an expert in the field. See Blech Sec. Litig., 2003 WL 1610775, at *20 ("[T]he text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.").

The opinions in Surls's expert report are based on his extensive experience in the brokerage industry. There is no indication that his opinions are based on any objective testing or that they have been peer reviewed. However, as previously stated, the four Daubert factors cannot be applied to every expert in every case, and in certain fields, experience in the industry is the predominant, if not sole, basis for reliable expert testimony. Given Surls's extensive experience in the industry, his opinions on the ownership transfer process are sufficiently reliable.

In another part of his expert report, Surls concluded that ABB performed its duties in a responsible, ethical, and professional manner. Surls also concluded that the Ayers Oil's payment of $250,000 to the prospective buyer served as an acknowledgment that the company failed to close the deal. (Doc. 72, Ex. 3 at 5.) This is not proper expert testimony. See In re Acceptance Ins., 423 F.3d at 905. An expert may not provide the jury with legal conclusions. Williams, 922 F.2d at 1360. These portions of Surls's opinion will be excluded at trial.

In a final section of his report, Surls addressed specific allegations found in the complaint. Several of his responses to the allegations are in the form of rhetorical questions. Because these rhetorical questions will not help the jury understand the evidence or determine facts at issue, they will be excluded at trial. See Fed. R. Evid. 702. Surls's other statements generally provide helpful background on the duties of a broker, and on the relationship between a broker and the buyer and seller. Surls may offer this testimony to the jury as long as the testimony avoids legal conclusions. See Warfield, 2009 WL 2421594, at *3.

The motion to exclude the expert testimony of Paul Surls is granted in part, and otherwise denied.

## VII.  CROSS-MOTIONS FOR SUMMARY JUDGMENT

ABB moves for summary judgment on its counterclaim against Ayers Oil, and on its third-party complaint against Robert and Steve Ayers. ABB argues that it was a licensed business broker in Illinois, and that it did not need a real estate license to facilitate a stock sale.  ABB also argues that it found a buyer that was ready, willing, and able to purchase the stock of Ayers Oil Co. and the stock of Illinois Ayers Oil Co.  Based on the brokerage agreement in place, extended by oral agreement, ABB seeks a commission of $685,402 from Ayers Oil and Robert and Steve Ayers, for finding these buyers.  The company further argues that Robert and Steve Ayers breached the stock sale agreement when they paid themselves bonuses in September 2008.  ABB argues that these bonuses caused the deal to fall through.  Finally, ABB argues that it did not act negligently.  (Docs. 75, 80, 85.)

Ayers Oil and Robert and Steve Ayers also move for summary judgment.  In particular, they seek summary judgment on all claims asserted by ABB, and on Count I of Ayers Oil's amended complaint, which seeks a declaration that ABB is not entitled to a commission under the Listing Agreement.  Ayers Oil argues that ABB cannot sue for the commission because it is not a licensed real estate broker in the state of Missouri. Ayers Oil also argues that ABB cannot collect the commission because Ayers Oil signed the Purchase Agreement in August 2008, well after the  Listing Agreement terminated in February 2008. Robert and Steve Ayers argue they are entitled to summary judgment on Count I of ABB's third-party complaint because they were not parties to that contract.  They also argue for summary judgment because ABB was not a registered business broker, and because the contract extension was not in writing.  Finally, Ayers Oil and Robert and Steve Ayers argue that ABB's claims of quantum meruit fail because there was no final sale, and because there is no evidence concerning the reasonable value of ABB's services.  (Docs. 79, 82, 88.)

## VIII.  STATEMENT OF UNDISPUTED FACTS

In 2002, Bill Fecht, a business broker and the head of business acquisition for Clark Oil Company, told Terry Monroe, a business broker

and the president of ABB, that Robert and Steve Ayers were interested in selling their business. (Monroe depo. at 8, 37; Fecht depo. at 12.) Under his agreement with ABB, Fecht would earn 40% of the total commission on the Ayers sale. (Monroe depo. at 38; Fecht depo. at 14.) ABB is a Florida corporation, but has offices in Illinois, and is registered as a business broker in Illinois. (Doc. 85, Ex. 1.) Monroe is not himself licensed as a business broker in Illinois. (Monroe depo. at 7.)

On September 12, 2006, ABB and Ayers Oil entered into an agreement, titled "AGREEMENT PROVIDING SOLE & EXCLUSIVE RIGHT OF SALE AS A TRANSACTION BROKER." (Doc. 75, Ex. 1.) This agreement (the Brokerage Agreement) provided ABB with the exclusive right to market and sell Ayers Oil between the time of the agreement and March 6, 2007. (Id. at ¶¶ 1-2.) The agreement stated that the price of Ayers Oil was $27 million. (Id. at ¶ 3.) If ABB could procure a "ready, able and willing buyer" at the $27 million price, or a different price acceptable to Ayers Oil, ABB would receive a sales commission of four percent. (Id. at ¶ 4.) More specifically, the sales commission paragraph provided,

> **Sales Commission.** The amount of the sale commission shall be Four percent (4%). Upon procuring a ready, able and willing buyer for the business for the price set forth above, or for such other price and terms as Owner may accept; . . . or upon Owner failing or refusing to complete or consummate a sale, lease, exchange, merger or other disposition of all or any portion of the business after entering into a contract to do so while this agreement is in effect; or the business or any part or portion of it is sold, leased, exchanged, merged or otherwise disposed in 12 months after the termination date of this agreement to any person who or entity which was informed directly through the efforts of ABB that the business was for sale. . . . The commission shall be paid to American Business Brokers at closing. . . .

(Id.) The agreement also stated that Ayers Oil had appointed ABB as its "TRANSACTION BROKER" for the purpose of finding a buyer for the company. (Id. at ¶ 5.) The agreement was signed by Stephen Ayers on behalf of Ayers Oil Co. and by Terry Monroe on behalf of American Business Brokers, Inc. (Id. at 2.)

ABB and Ayers Oil extended the terms of the Brokerage Agreement to September 12, 2007, and then later, to February 12, 2008. (Doc. 75,

Exs. 2, 3.)  After that, there were no other written extensions, and Robert Ayers considered the Brokerage Agreement to have ended on February 12, 2008.  (R. Ayers depo. at 37.)  At the same time, ABB continued to call and meet with Ayers Oil in an effort to try to sell the company.  (<u>Id.</u> at 37-38.)  On February 28, 2008, Robert and Steve Ayers met with Bart Basi, Bill Fecht, Paul Richards, and Terry Monroe, in Hannibal, Missouri.  (<u>Id.</u> at 49.)  After that meeting, Robert Ayers stated that he told Monroe that he was not interested in extending the brokerage contract.  (<u>Id.</u> at 50.)  He was, however, still interested in selling Ayers Oil.  (<u>Id.</u> at 49, 53.)  According to Fecht, Robert and Steve Ayers never told him to stop looking for a buyer.  (Fecht depo. at 62.)  According to Fecht, Monroe said the Ayers were not going to sign another extension, but that one of the Ayers said they should continue working on the deal if they had a legitimate buyer.  (<u>Id.</u> at 54.)  According to Monroe, Steve Ayers "'absolutely'" wanted ABB to continue to work on selling the business.  (Monroe depo. at 70.)

In March 2008, someone affiliated with ABB, either Terry Monroe or Bill Fecht, called Jeffrey Bush, Partner and Manager of Convenience Stores, LLC, to tell him there was a Missouri company for sale.  (Bush depo. at 7-8.)  Bush understood that Ayers Oil wanted to structure the sale as a stock sale for tax purposes.  (<u>Id.</u> at 11.)  In May 2008, ABB called the Ayers with a potential buyer.  (S. Ayers depo. at 32.)  Robert and Steve Ayers were unfamiliar with Convenience Stores, LLC, until Monroe brought the company to their attention.  (R. Ayers. depo at 6; S. Ayers depo. at 6.)  Steve Ayers did not tell ABB to stop pursuing potential buyers.  (S. Ayers depo. at 33.)  On May 14, 2008, Monroe, Bush, Fecht, and Steve Ayers met in Hannibal, Missouri.  (Bush depo. at 46-47.)  According to Bush, Steve Ayers expressed an interest in selling Ayers Oil Co. during this meeting.  (<u>Id.</u> at 47.)

Between May and July 2008, Bush inspected all the convenience stores owned by Ayers Oil, trying to learn how it handled its customers and operated its stores.  (<u>Id.</u> at 48.)

On August 25, 2008, Robert and Steve Ayers met with Jeffrey Bush, Bill Schank, another partner for Convenience Stores, Terry Monroe, and Bill Fecht, in Saint Charles, Missouri.  (S. Ayers depo. at 39-40; R.

Ayers depo. at 52-53; Bush depo. at 51.) During this meeting, Bush said he was interested in buying the company for around $19 million. (S. Ayers depo. at 40.) On September 5, 2008, Steve Ayers was presented with a purchase agreement at the Ayers Oil office in Canton, Missouri. (Id. at 42-43.) Ayers did not remember whether he signed the purchase agreement during this meeting. (Id. at 43-44.)

On August 25, 2008,[2] Robert and Steve Ayers, "as individuals of Ayers Oil Co." and Illinois Ayers Oil Co., entered into an agreement (Purchase Agreement) with Convenience Stores, LLC, for the sale of "all common stock and any other ownership interests owned by Robert Ayers and Steve Ayers in Ayers Oil Company, Inc. and Illinois Ayers Oil Company, Inc. . . ." (Doc. 75, Ex. 4 at 1.) Jeffrey Bush prepared the Purchase Agreement. (Bush depo. at 9.) After the agreement was signed, Bush toured the convenience stores of Illinois Ayers Oil as well. (Id. at 49.) According to the marketing materials, a significant portion of the business being sold included convenience stores and truck stops. (Doc. 78, Ex. 9.) A terminal on the Mississippi River was a key component of the deal for Convenience Stores. (Bush depo. at 68-70.)

The Purchase Agreement noted that Robert and Steve Ayers owned 100% of the outstanding common stock of Ayers Oil Co., and that Robert Ayers owned 51% of the outstanding common stock of Illinois Ayers Oil Co.[3] (Doc. 75, Ex. 4 at 1.) The Purchase Agreement was structured as a stock sale for tax purposes. (R. Ayers depo. at 10-11, 25; S. Ayers depo. at 8.) By signing the agreement, Robert Ayers understood he was obligated to sell his stock in the Illinois Ayers Oil Co. (R. Ayers depo. at 25.)

The parties hoped to close the deal by December 31, 2008, but recognized that there were still several issues to work out. (Doc. 75, Ex. 4 at 1.) Conducting due diligence and securing financing for the deal were two of these prerequisites. (Id. at 3.) In particular, the

---

[2]The Purchase Agreement states that it was signed on August 25, 2008. (Doc. 75, Ex. 4.) Yet, Steve Ayers testified that he did not receive the agreement until September 5. (S. Ayers depo. at 43.) This discrepancy is not explained.

[3]Robert Ayers's majority share in the Illinois Ayers Oil Co. was not held in his name. (Doc. 75, R. Ayers depo. at 24-25.) Instead, the stock was held in a limited liability company. (Id.)

agreement stated that Convenience Stores needed to secure a commitment letter from a lender by October 31, 2008. (Id.) If the parties failed to meet the requirements for closing the deal, the Purchase Agreement would become null and void. (Id.)

According to the Purchase Agreement, the purchase price for Ayers Oil Co. was to be calculated as five times the EBITDA value;[4] that value was expected to be $19 million.[5] (Id. at 1.) The purchase price for Illinois Ayers Oil Co. would also be five times the EBITDA value. (Id. at 2.) In calculating the EBITDA value, the Purchase Agreement provided that no other dividends or bonuses would be paid to the stockholders of either company from the time of the Purchase Agreement until the time of closing. (Id.) The agreement also stated that farm land, life insurance policies, and an appliance store would be distributed out of the company before closing. (Id.) According to Robert Ayers, there were other things that were supposed to be part of the excluded list, but he was not sure whether Convenience Stores was aware of these items. (R. Ayers depo. at 17-18.)

Under the payment clause of the Purchase Agreement, Ayers Oil agreed to take back a promissory note in exchange for 25% of the purchase price. (Doc. 75, Ex. 4 at 2.) The interest rate on the promissory note was expected to be 5.5%. (R. Ayers depo. at 29.)

The Purchase Agreement stated that Robert and Steve Ayers were represented by ABB, that they had entered into a brokerage agreement with ABB, and that they would "pay all commissions due American Business Brokers at the time of Closing." (Doc. 75, Ex. 4 at 8.) Bush had drafted this paragraph because he wanted it clear that Convenience Stores would not be paying ABB's commission. (Bush depo. at 53-54.)

Robert and Steve Ayers and Convenience Stores, LLC each reserved the right to terminate the Purchase Agreement if certain obligations

---

[4]EBITDA stands for earnings before interest, income taxes, depreciation, and amortization. (Doc. 75, Ex. 4 at 1.) Bush calculated the $19 million figure on his own by using Ayers Oil's financial statements from the previous year. (Bush depo. at 13.)

[5]Steve Ayers believed the $19 million price was a firm offer, rather than a projected price. (Doc. 75, S. Ayers depo. at 7.)

were unmet. (Doc. 75, Ex. 4 at 8-9.) Robert Ayers was aware of the commission clause in the agreement, and interpreted it to mean that ABB would earn a four-percent commission only when a deal closed. (R. Ayers depo. at 35-36.) The Purchase Agreement was signed by Convenience Stores, LLC, and Robert and Steve Ayers. (Doc. 75, Ex. 4 at 10.) The Ayers did not consult with an attorney before signing the Purchase Agreement. (S. Ayers depo. at 6; R. Ayers depo. at 6-7.) Monroe did not remember any conversations about having a lawyer review the agreement. (Monroe depo. at 101.)

Steve Ayers read and understood the Purchase Agreement when he signed it. (S. Ayers depo. at 6.) Robert Ayers, however, did not read the entire agreement before he signed it. (R. Ayers depo. at 9.) He did not have an understanding of the basic terms of the agreement. (Id.) In fact, he was unfamiliar with the proposed closing date of December 2008, and was unaware of the dividend/bonus provision until after September 30, 2008. (Id. at 14, 21.) His son had brought him the agreement to sign, and he did so. (Id. at 9.) When he had signed the Purchase Agreement, Robert Ayers believed that five times the EBITDA value was a favorable multiplier, but he was later told that it was a low multiplier. (Id. at 11.) He believed the business was worth $24 million. (Id. at 39.)

On September 30, 2008, Ayers Oil Co. paid Robert and Steve Ayers $1 million each, in bonuses, and paid other employees a total of $760,000 in bonuses. (R. Ayers depo. at 21, 24, 68; Crane depo. at 36.) Before doing so, Robert and Steve Ayers asked Terry Monroe his opinion about paying the bonuses. (R. Ayers depo. at 21; S. Ayers depo. at 16.) According to the Ayers, Monroe said they could pay the bonuses if the bonuses were part of the ordinary course of the business. (R. Ayers depo. at 21, 23; S. Ayers depo. at 16.) Monroe stated that he told the Ayers to run the business as they normally would, but noted that the Purchase Agreement addressed bonus payments. (Monroe depo. at 103.) Monroe was not aware of the amount of the bonuses. (Id. at 115; R. Ayers depo. at 21, 67-68.)

At the time, Robert Ayers believed the dividend/bonus provision in the Purchase Agreement did not apply until closing. (R. Ayers depo. at

23.)  He did not talk to his lawyer or accountant about paying the bonuses, but he discussed the bonuses with Jim Crane, the in-house financial accountant for Ayers Oil.  (<u>Id.</u> at 23-24, 67-69; Crane depo. at 7.)  Robert Ayers did not discuss with Crane the effect these bonuses might have on the company's purchase price.  (R. Ayers depo. at 69.)  For his part, Steve Ayers understood that the bonuses could affect the purchase price of the stock.  (S. Ayers depo. at 17-18.)

In early October 2008, Monroe sensed there were some issues relating to the sale of Ayers Oil.  (Monroe depo. at 107-08.)  According to Monroe, Bush was having trouble getting certain financial statements from the Ayers.  (<u>Id.</u> at 108.)  On October 13, 2008, Robert Ayers was still interested in selling the business.  (R. Ayers depo. at 60.)  On October 28, 2008, Jeffrey Bush sent an e-mail to Steve Ayers, Terry Monroe, and Bill Fecht, letting them know that he had $25 million available, and that his side was continuing to proceed with the deal. (Doc. 75, Ex. 3.)  Around this time, Bush provided the Ayers with a personal financial statement that placed his net worth at $14 million. (Doc 75, Ex. 6.)  Steve Ayers assumed the $14 million figure was reliable, and saw nothing in the financial statement that would have led him to question Bush's ability to proceed with the sale.  (S. Ayers depo. at 20-21.)  He also knew that Convenience Stores had deposited $50,000 with a branch of Chicago Title.  (<u>Id.</u> at 21.)  Still, Steve Ayers was concerned that Bush was not going to be able to come up with the money to complete the deal.  (<u>Id.</u> at 22.)  One of his concerns was that Convenience Stores had not provided firm financing; their financing was non-binding.  (<u>Id.</u> at 26, 31.)  He did not know whether Convenience Stores would be able to buy the stock of Ayers Oil and Illinois Ayers Oil.  (<u>Id.</u> at 31.)

By October 31, 2008 – the deadline set by the Purchase Agreement – Robert Ayers also did not know whether Convenience Stores would be able to come up with the money necessary to buy Ayers Oil and Illinois Ayers Oil.  (R. Ayers depo. at 31, 45.)  He was concerned about whether or not Convenience Stores had a commitment from a lender.  (<u>Id.</u> at 31.)  For his part, Bush complained that he did not have a commitment letter because he had been unable to provide the bank with the financial

information it required.  (Bush depo. at 27.)  To obtain the loan, Bush needed audited financial statements and other documents from the Ayers. (Id. at 28.)  If he had gotten the necessary information, Bush did not think he would have had any trouble getting a loan commitment.  (Id. at 29, 72.)  Bush did not think that Terry Monroe was failing to forward information to him that Monroe had received from the Ayers.  (Id. at 46.)  Bush always received the financial information he requested, but he had complaints about the timeliness of the disclosures.  (Id. at 56-57.)

In November 2008, Jim Crane provided Bush with a list of real estate that was to be excluded from the deal.  (Bush depo. at 40; Crane depo. at 17.)  Bush learned the exclusion meant that Ayers Oil had owned the properties, but was not operating them at the time.  (Bush depo. at 41.)  From his perspective, the excluded assets presented a problem because the properties could either be developed, with a new convenience store placed on the land, or the property could be sold and used to retire debt.  (Id. at 41-42.)

Jeffrey Bush was still interested in buying Ayers Oil and the controlling share of Illinois Ayers Oil on November 17, 2008.[6]  (Id. at 73-74.)  He believed that Steve Ayers was also willing to go through with the deal.  (Id. at 74.)  But after Thanksgiving, Bush learned about the bonus payments.  (Id. at 74-75.)  For Bush, the bonus payments were preventing the deal from closing.  (Id. at 74.)  In his opinion, the bonuses had stripped the company of capital, making it difficult to agree on a value for the company.[7]  (Id.)  According to Monroe, Bush was still willing to buy the company if the money from the bonuses was put back into the company.  (Monroe depo. at 114.)

On December 1, 2008, Terry Monroe called Steve Ayers to discuss the bonuses.  (S. Ayers depo. at 46.)  The bonuses were going to impact the

---

[6]Bush believed the proposed deal involved Convenience Stores buying all the stock in Ayers Oil, and a majority interest in Illinois Ayers Oil.  (Bush depo. at 23-24.)

[7]When Bush calculated the $19 million figure, his calculation was based on adding back in the bonuses.  (Bush depo. at 14.)  It was important to him that the company not be stripped of its working capital through dividends and bonuses.  (Id. at 21.)

amount of the purchase price. (Id.; Monroe depo. at 110-11.) To remedy
the situation, Bush offered to let Robert and Steve Ayers return the
bonuses back to the company. (S. Ayers depo. at 47; Bush depo. at 79.)
The idea was scrapped because returning the employees' bonuses would
have alienated them, and having the shareholders return the Ayers'
bonuses would have been financially devastating. (R. Ayers depo. at 62-
63.) According to Monroe, Bush also did not want the employees' bonuses
returned, because he did not want to purchase a company with angry
employees. (Monroe depo. at 114.) Robert Ayers considered paying back
the employee bonus money by himself, but decided not to. (R. Ayers at
63-64.) Steve Ayers understood that if the bonuses were paid back to
the company, he and his father would still get five times the EBITDA
value on the portion repaid. (S. Ayers depo. at 47; Bush depo. at 79.)
In Bush's opinion, the decision to pay the bonuses indicated that the
Ayers were not interested in selling the company. (Bush depo. at 82.)

At some point, Steve Ayers called Terry Monroe to inform him that
the deal was not going to go through. (S. Ayers depo. at 50.) He
thought any offer would be around $12 to $13 million, and he was
unwilling to sell for less than $19 million. (Id.) Bush abandoned his
interest in trying to buy the business some time between December 2 and
December 11. (Bush depo. at 85.)

After the deal collapsed, Monroe told the Ayers that he had been
working on the deal for over two years, and asked Steve if he felt that
ABB should be compensated for its efforts. (Monroe depo. at 112-13.)
According to Monroe, Steve replied, "oh, no, not at all." (Id. at 113.)
Monroe did not keep any records of how much time he spent working on the
Ayers Oil deal, but he documented several of his efforts in a diary.
(Id. at 118-19; Doc. 80, Ex. 5.)

On December 11, 2008, Robert and Steve Ayers entered into a
Termination Agreement with Convenience Stores, LLC. (Doc. 75, Ex. 9.)
Under the terms of the agreement, Robert and Steve Ayers paid
Convenience Stores $250,000 to terminate the Purchase Agreement and to
resolve all outstanding disputes. (Id.; R. Ayers depo. at 72.) Two of
the disputes concerned "the failure of Seller's agent to timely provide
financial information or other information to Buyer, and whether the

Purchase Agreement is null and void." (Doc. 75, Ex. 9 at 1.) Part of Convenience Stores's claim for damages was based on Bush's decision to sell some of his properties to raise money for the deal. (Bush depo. at 87.) Jeffrey Bush signed the Termination Agreement on behalf of Convenience Stores, LLC, and Robert and Steve Ayers signed the agreement on behalf of the "Sellers." (Doc. 75, Ex. 9.) Once again, Robert Ayers signed the document on his son's recommendation. (R. Ayers depo. at 75.) Robert and Steve Ayers decided to settle with Convenience Stores to avoid having to go to court; Convenience Stores had been threatening to sue Ayers Oil. (S. Ayers depo. at 58.)

Steve Ayers believed that ABB should have told Ayers Oil about the bonus issue, since it was representing the company. (Id. at 53, 55.) He also believed ABB had an obligation to provide Ayers Oil with brokerage services that met a certain level of competency. (Id. at 63.) Steve Ayers did not talk to his accountant about the bonuses, and he did not perform any calculations on his own to see how paying the bonuses might affect the purchase price. (Id. at 53-54.) Robert Ayers believed ABB was responsible for failing to provide Convenience Stores with the necessary financial information about Ayers Oil. (R. Ayers depo. at 74.) He did not know whether ABB or Terry Monroe had any part in negotiating the Termination Agreement. (Id. at 75.)

On December 19, 2008, ABB's attorneys sent a demand letter to Robert and Steve Ayers. (Doc. 75, Ex. 5.) The demand letter argued that ABB had procured a ready, able and willing buyer for Ayers Oil and for Robert Ayers's 51% stake in Illinois Ayers Oil, and demanded the Ayers pay ABB a commission of $923,000. (Id.) Robert and Steve Ayers did not respond to this demand letter. (R. Ayers depo. at 81; S. Ayers depo. at 64.) On December 31, 2008, Ayers Oil Co. brought this action against ABB. (Doc. 1 at 1.)

### IX.  SUMMARY JUDGMENT STANDARD

Summary judgment must be granted when the pleadings and proffer of evidence demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986);

<u>Devin v. Schwan's Home Serv., Inc.</u>, 491 F.3d 778, 785 (8th Cir. 2007). The court must view the evidence in the light most favorable to the non-moving party and accord it the benefit of all reasonable inferences. <u>Devin</u>, 491 F.3d at 785. A fact is "material" if it could affect the ultimate disposition of the case, and a factual dispute is "genuine" if there is substantial evidence to support a reasonable jury verdict in favor of the non-moving party. <u>Die-Cutting Diversified, Inc. v. United Nat'l Ins. Co.</u>, 353 F. Supp. 2d 1053, 1054-55 (E.D. Mo. 2004).

Initially, the moving party must demonstrate the absence of an issue for trial. <u>Celotex</u>, 477 U.S. at 323. Once a motion is properly made and supported, the non-moving party may not rest upon the allegations in its pleadings but must instead proffer admissible evidence that demonstrates a genuine issue of material fact. Fed. R. Civ. P. 56(e); <u>Howard v. Columbia Pub. Sch. Dist.</u>, 363 F.3d 797, 800 (8th Cir. 2004); <u>Krein v. DBA Corp.</u>, 327 F.3d 723, 726 (8th Cir. 2003).

## **X. DISCUSSION**

**Real Estate License**

Ayers Oil argues that ABB is not entitled to a commission because it was not a licensed real estate broker in the state of Missouri.

Under Missouri law, an individual or a company must be a licensed real estate broker to recover a commission associated with a real estate transaction. Mo. Rev. Stat. § 339.160. In particular, the law provides that,

> No person, partnership, corporation, or association engaged within this state in the business or acting in the capacity of a real estate broker or real estate salesperson shall bring or maintain an action in any court in this state for the recovery of compensation for services rendered in the buying, selling, exchanging, leasing, renting or negotiating a loan upon any real estate without alleging and proving that such person, partnership, corporation, or association was a licensed real estate broker or salesperson at the time when the alleged cause of action arose.

<u>Id.</u> A real estate broker is any individual or entity, who, among other things, "[a]ssists or directs in the procuring of prospects, calculated

to result in the sale, exchange, leasing or rental of real estate." Mo. Rev. Stat. 339.010.1(7).

The Missouri legislature passed the provisions of Chapter 339 to protect the public from the evils of fraud and incompetence. <u>Gen. Aggregate Corp. v. LaBrayere</u>, 666 S.W.2d 901, 908 (Mo. Ct. App. 1984); <u>Mueller v. Ruddy</u>, 617 S.W.2d 466, 474 (Mo. Ct. App. 1981). By preventing unlicensed brokers from recovering any commission, Chapter 339 removed any financial incentive an unlicensed broker might have for selling to the public. <u>Mueller</u>, 617 S.W.2d at 474. As a result, the provisions of Chapter 339 are to be strictly construed against a party claiming to be exempt from those portions of the law. <u>Id.</u>

There is no bright line rule for determining when a transaction or service falls within Chapter 339. <u>See Ingalls v. Neufeld</u>, 487 S.W.2d 52, 55 (Mo. Ct. App. 1972.) In some states with similar provisions, the laws against unlicensed real estate brokers do not extend to the sale or exchange of a business as a going concern -- even though such a sale might include some interest in realty. <u>Id.</u> In other states, the transaction can be considered severable, and the broker can recover a commission to the extent the sale involved personal property. <u>Id.</u> But under either approach, "the determinative and controlling factors are the terms and subject matter of the contract actually entered into by the vendor and purchaser." <u>Id.</u> The name given to the broker's services is immaterial; if real estate is going to be the principal element involved in the transaction, the broker must have a license. <u>Id.</u> at 56. Looking to these general guidelines, when the sale of a business is contingent upon the satisfactory assumption of an existing lease, the transaction is considered one rooted in "real estate," and requires a licensed real estate broker to complete the transaction. <u>Knight v. Johnson</u>, 741 S.W.2d 842, 845 (Mo. Ct. App. 1987).

In this case, the Purchase Agreement between Convenience Stores and Ayers Oil Co. and Illinois Ayers Oil Co. did not principally concern the sale or leasing of real estate. By its plain terms, the contract between the two parties was for the sale of "all common stock and any other ownership interests owned by Robert Ayers and Steve Ayers in Ayers Oil Company, Inc. and Illinois Ayers Oil Company, Inc. . . ." The

contract did not require Convenience Stores to assume any of Ayers Oil's leases. Instead, the contract required Convenience Stores to purchase the plaintiff's stock, which was to be calculated based on the company's EBITDA value. Looking to the underlying purpose of the statute, this is not a situation where the buyer, the seller, or the public would have been at risk of fraud or incompetence. See LaBrayere, 666 S.W.2d at 908 ("[W]e find that the purpose of the statute was not violated by allowing plaintiff to recover for his services. No one was misled or defrauded. There was no danger of an unlicensed broker taking advantage of the public."). The proposed transaction concerned one corporation purchasing the stock of two other corporations, according to the EBITDA value of the corporations. Looking to Chapter 339, Ingalls, and LaBrayere, ABB did not need a real estate license to act as a broker for the proposed transaction.

## Expired Contract

Ayers Oil argues that ABB cannot collect the commission because Ayers Oil signed the Purchase Agreement in August 2008, well after the Listing Agreement terminated in February 2008.

Ordinarily, the language of a written contract controls and will be enforced as written. AAA Unif. and Linen Supply, Inc. v. Barefoot, Inc., 81 S.W.3d 133, 138 (Mo. Ct. App. 2002). However, evidence of a subsequent oral agreement between the parties "will be deemed to modify a written contract." Id. Indeed, it is well settled that a written listing contract may be modified by a subsequent oral agreement. Dyer-Bussey Realtors, Inc. v. Wright, 647 S.W.2d 215, 217 (Mo. Ct. App. 1983).

The parties agree that the original Brokerage Agreement was extended to February 12, 2008. After that, there were no other written extensions. Robert Ayers considered the Brokerage Agreement to have ended on this date, and stated that he told Monroe he was not interested in extending the Brokerage Agreement. But according to Bill Fecht, Robert and Steve Ayers never told him to stop looking for a buyer. And according to Terry Monroe, Steve Ayers "'absolutely'" wanted ABB to continue to work on selling the business. In fact, in May 2008, Monroe,

Fecht, and Steve Ayers met with Jeffrey Bush to discuss a possible deal between Convenience Stores and Ayers Oil. The Ayers met with Bush and Monroe once again on August 25, 2008.

Viewing this evidence in the light most favorable to ABB, a reasonable jury could find that the Brokerage Agreement was extended by oral agreement up to August 25, 2008, the date of the Purchase Agreement.

**Ready, Willing, and Able Buyer**

ABB argues that it found a buyer that was ready, willing, and able to purchase the stock of Ayers Oil Co. and Illinois Ayers Oil Co. Ayers Oil, on the other hand, argues that ABB is not entitled to any commission under the Listing Agreement.

Unless the contract provides otherwise, a broker earns a commission from a seller when he produces a buyer that is ready, willing, and able to buy on the terms specified by the seller. <u>Dark v. MRO Mid-Atl. Corp.</u>, 876 S.W.2d 714, 716 (Mo. Ct. App. 1994). There is no requirement that the sale actually be completed; the broker can earn the commission "<u>whether or not the sale is completed</u>." <u>Id.</u> There is a difference, however, between a sales contract (or purchase agreement) that never becomes an enforceable obligation, and one that is simply not performed. <u>Id.</u> "In many instances, the seller and buyer may enter a binding agreement to transfer the property but never perform their respective promises." <u>Id.</u> at 717. In those cases, the broker is entitled to his commission unless the contract states otherwise. <u>Id.</u> In other instances, the buyer or the seller may make the commitment to buy or sell contingent on several conditions that do not get satisfied. <u>Id.</u> In those cases, the broker is not entitled to a commission. <u>Id.</u>

In this case, the Brokerage Agreement provided that ABB would earn a brokerage fee if it could procure a "ready, able and willing buyer" for Ayers Oil for $27 million, "or for such other price and terms as Owner may accept." On August 25, 2008, Ayers Oil Co. and Illinois Ayers Oil Co. entered into the Purchase Agreement with Convenience Stores, LLC. It is undisputed that ABB introduced Convenience Stores to the

Ayers, and that Convenience Stores expressed an interest in buying the stock of the two companies.

It is not clear, however, that Convenience Stores was an "able" buyer. To be an "able" purchaser, the buyer must have the financial ability to finance the purchase. Alcorn v. Moore, 386 S.W.2d 907, 910 (Mo. Ct. App. 1965). In this case, the Purchase Agreement itself declared that the buyer might "not be able to obtain financing at a cost . . . that would make this project viable" by the October 31, 2008 deadline. (Doc. 75, Ex. 4 at 3.) This language is found in the section titled "CONDITIONS TO MEET FOR CLOSING." Indeed, as the deadline approached, Steve Ayers was concerned that Bush was not going to be able to secure the financing needed to complete the deal. At the time, Convenience Stores had only found non-binding financing. Robert Ayers expressed similar concerns. On October 31, 2008, Robert Ayers did not know whether Convenience Stores had a commitment from a lender. Viewing the evidence in the light most favorable to Ayers Oil, Ayers Oil and Convenience Stores conditioned the stock purchase on the ability of Convenience Stores to secure the appropriate financing. The record is equivocal on whether or not Convenience Stores was or was not an able purchaser. Dark, 876 S.W.2d at 716; Alcorn, 386 S.W.2d at 910. ABB is not entitled to summary judgment on its breach of contract claims. These claims remain for trial.

Ayers Oil and Robert and Steve Ayers seek summary judgment on this issue as well. They argue that ABB is not entitled to any commission.

As noted above, a broker earns a commission by finding and producing a buyer that is ready, willing, and able to buy according to the terms of the contract. Byrd v. Frank B. Wilson Trust, 182 S.W.3d 701, 707 (Mo. Ct. App. 2006). There is no requirement that the sale actually be completed. Dark, 876 S.W.2d at 716; see also Specialty Rests., Corp. v. Adolph K. Feinberg Real Estate, 770 S.W.2d 324, 327 (Mo. Ct. App. 1989) (noting that the broker earns a commission upon the "execution of a sale contract by such a [ready, willing, and able] buyer whether or not the contract is in fact executed."). As a result, a seller's bad conduct cannot defeat the broker's right to a commission. See Byrd, 182 S.W.3d at 707; Alcorn, 386 S.W.2d at 912. In cases where

the "owner refuses to complete the transaction by delivery, <u>the law declares the sale complete as far as the broker is concerned</u>." <u>Byrd</u>, 182 S.W.3d at 707 (quoting <u>Concannon v. Point Mining & Milling Co.</u>, 135 S.W. 988, 992 (Mo. 1911)). Put differently, a seller cannot deprive a broker of the right to a commission if the seller is guilty of fraud or bad faith that prevents the broker's performance of the contract. <u>Alcorn</u>, 386 S.W.2d at 912.

After the Purchase Agreement was signed, Ayers Oil Co. paid Robert and Steve Ayers $1 million each, in bonuses. Ayers Oil Co. made these payments even though the Purchase Agreement provided that no bonuses would be paid until the time of closing. For Jeffrey Bush, these bonus payments prevented the deal from closing. In his opinion, the bonuses had stripped the company of capital, which made it more difficult for the two sides to agree on a price for Ayers Oil. Steve Ayers understood that the bonuses would affect the purchase price for the company. And even though Bush offered to let the Ayers return the bonuses to the company, they decided not to do so.

More to the point, Terry Monroe stated that Bush was having trouble obtaining certain financial statements from the Ayers. According to Jeffrey Bush, Convenience Stores needed these financial statements to obtain its loan. If the Ayers had provided the necessary documents, Bush believed he would not have had any difficulty obtaining the loan commitment.

Viewing this evidence in the light most favorable to ABB, a reasonable jury could find that Ayers Oil Co. and Robert and Steve Ayers acted in bad faith, and that their conduct prevented the sale from being completed. The issue of whether ABB is entitled to a commission for finding a "ready, able and willing buyer" remains for trial.

**PRIVITY OF CONTRACT**

Robert and Steve Ayers argue that they are entitled to summary judgment on Count I of ABB's third-party complaint because they were not parties to that contract.

For a party to bring a lawsuit on a contract, that party must either be a party to the contract, or in privity to the contract. <u>RGB2,</u>

<u>Inc. v. Chestnut Plaza, Inc.</u>, 292 S.W.3d 409, 412 (Mo. Ct. App. 2009). The doctrine of privity means that a party "cannot acquire rights or be subject to liabilities <u>arising under</u> a contract to which he is not a party." <u>Black's Law Dictionary</u>, 1218 (7th ed. 1999) (quoting G.H. Treitel, <u>The Law of Contract</u>, 538 (8th ed. 1991)).

The Brokerage Agreement stated that it was an agreement "by and between AMERICAN BUSINESS BROKERS, INC. hereinafter referred to as 'ABB', and AYERS OIL CO. hereinafter referred to as 'Owner'. . . . (Doc. 75, Ex. 1 at 1.) The agreement was signed by Stephen Ayers, on behalf of Ayers Oil Co., and by Terry Monroe, on behalf of ABB. (<u>Id.</u> at 2.) Robert and Stephen Ayers were not parties to this contract. Their names are not mentioned anywhere in the Brokerage Agreement. Stephen Ayers was merely acting as an agent for Ayers Oil Co. when he signed his name to the agreement. "Where an individual signs an agreement on behalf of a disclosed principal and the capacity in which the individual signs is evident, the individual will not be personally liable on the instrument absent clear and explicit evidence of an intention to be bound." <u>Prof'l Laundry Mgmt. Sys. Inc. v. Aquatic Techs., Inc.</u>, 109 S.W.3d 200, 204 (Mo. Ct. App. 2003). Since there is no evidence to show the Ayers intended to be personally bound by the Brokerage Agreement, Count I of ABB's third-party complaint is dismissed with prejudice. <u>See id.</u> at 204-05.

**Registered with Illinois**

Ayers Oil Co. argues that ABB cannot collect a commission because it is not registered with the Illinois Secretary of State. (Doc. 79 at 17-18.) ABB has attached, as an exhibit, a document from the Illinois Secretary of State that certifies that "American Business Brokers, Inc. is registered as a Business Broker pursuant to the Illinois Business Brokers Act of 1995, effective January 1, 2009 through December 31, 2009." (Doc. 85, Ex. 1.) An online search of the records of the Illinois Secretary of State revealed that American Business Brokers, Inc. remains a registered broker. Illinois Secretary of State, http://www.ilsos.gov/brokersearch/ (last visited July 19, 2010). Summary judgment is inappropriate on this claim.

**Quantum Meruit**

Ayers Oil and Robert and Steve Ayers argue that they are entitled to summary judgment on Count II of ABB's counterclaim, and on Count II of ABB's third-party complaint. They argue that ABB cannot prove the reasonable value of its services.

A claim for quantum meruit relies on an implied promise that a party will pay reasonable compensation for valuable services that were provided at that party's request, or with the party's approval. Coldwell Bankers-Gordon Co. Realtors v. Waters, 791 S.W.2d 412, 415 (Mo. Ct. App. 1990). The purpose behind the quantum meruit doctrine is to prevent unjust enrichment; to prevent a party from unjustly retaining a benefit it has not paid for. Id. As a result, a party that has breached an implied contract must return, to the injured party, the reasonable value of the services provided. Olathe Millwork Co. v. Dulin, 189 S.W.3d 199, 205 n.6 (Mo. Ct. App. 2006); Id.

To prevail on a quantum meruit claim, the broker must show that (1) it provided services at the seller's request or with the seller's approval, (2) the services had a reasonable value, and (3) the seller refused to pay for these services after a demand by the broker. Dulin, 189 S.W.3d at 206; Mills Realty, Inc v. Wolff, 910 S.W.2d 320, 322 (Mo. Ct. App. 1995). The broker has the burden of proving the reasonable value of the services provided. Wolff, 910 S.W.2d at 322. In fact, failure to prove the reasonable value of the services is fatal to a quantum meruit claim. Id.

In this case, ABB and Ayers Oil entered into a Brokerage Agreement. From the time of the agreement, up until May and August 2008, Terry Monroe and Bill Fecht worked to identify a possible buyer for the stock of Ayers Oil Co. and Illinois Ayers Oil Co. Steve Ayers did not tell ABB to stop pursuing potential buyers, and in August 2008, Ayers Oil entered into a Purchase Agreement with Convenience Stores, LLC - a company ABB brought to their attention.

During his deposition, Terry Monroe testified that he spent more than two years working on the deal between Ayers Oil and Convenience Stores. While he did not keep records of exactly how much time he spent working on the Ayers Oil deal, Monroe documented several of his efforts

in a dairy. (Doc. 80, Ex. 5.) There is also evidence that Monroe contacted several other businesses in an effort to secure a buyer for Ayers Oil stock. (Doc. 80, Exs. 7-11.) Finally, ABB's attorneys sent a demand letter to Robert and Steve Ayers demanding payment for the commission.

Viewing this evidence in the light most favorable to ABB, ABB may proceed on its quantum meruit claims. Monroe's diary, letters, and personal testimony provide a legally sufficient mechanism for determining the reasonable value of ABB's services. See Lucent Techs. Inc. v. Mid-W. Elecs., Inc., 49 S.W.3d 236, 247 (Mo. Ct. App. 2001) ("[A] plaintiff seeking payment for services under quantum meruit can testify as an expert in his own behalf as to [the] reasonable value of those services."). Summary judgment is inappropriate on this claim.

At trial, Monroe may not, however, use the Brokerage Agreement as a point of reference in establishing the reasonable value of his services. Wolff, 910 S.W.2d at 322. A broker can only rely on the contract to establish the reasonable value of services when the property or company has actually been sold. Id.

**Negligence**

ABB argues that it is entitled to summary judgment on Ayers Oil's negligence claim.

To prevail on a negligence claim, the plaintiff must show the defendant had a legal duty to protect the plaintiff from injury, the defendant failed to carry out that duty, and that this failure proximately caused an injury to the plaintiff. Midw. Bankcentre v. Old Republic Title Co. of St. Louis, 247 S.W.3d 116, 122-23 (Mo. Ct. App. 2008). Whether a legal duty exists is a question of law. Id. This legal duty can be created from one of three sources: (1) the legislature; (2) the common law; or (3) by contractual agreement. Id. Whether a party was negligent depends upon the surrounding circumstances and particular conduct involved. Id.

In this case, ABB owed Ayers Oil a duty to act with reasonable care, skill, and diligence. This duty was created by either the common law or by the Brokerage Agreement. See A.G. Edwards & Sons, Inc. v.

<u>Drew</u>, 978 S.W.2d 386, 394-95 (Mo. Ct. App. 1998) ("When an insurance broker agrees to obtain insurance for a client, with a view to earning a commission, the broker becomes the client's agent and owes a duty to the client to act with reasonable care, skill, and diligence.").

There is evidence in the record that ABB failed to carry out this duty. According to Robert Ayers, the Purchase Agreement excluded certain assets from the proposed sale, but there were other assets that were supposed to be part of this excluded list. The Purchase Agreement proposed to calculate the value of the businesses at five times the EBITDA value. At first, Robert Ayers believed this was a favorable multiplier, but he was later told that this was a low multiplier. Before Robert and Steve Ayers paid themselves the bonuses, they asked Monroe his opinion on the bonuses. Even though the bonuses decreased the value and purchase price of Ayers Oil Co., the Ayers contend that Monroe advised them that they could pay the bonuses if paying the bonuses were a normal part of the business. (S. Ayers depo. at 16; R. Ayers depo. at 21, 23.) Finally, the Ayers note that Jeffrey Bush complained that he did not timely receive the financial information he requested. According to the Termination Agreement, ABB was to blame for these delays. (Doc. 75, Ex. 9.)

Viewing this evidence in the light most favorable to Ayers Oil and Robert and Steve Ayers, a jury could find ABB failed to carry out its duty. A jury could also find that this failure proximately caused the deal between Ayers Oil Co. and Convenience Stores, LLC to collapse, which in turn caused Ayers Oil to settle with Convenience Stores for $250,000. See <u>Kraus v. Hy-Vee, Inc.</u>, 147 S.W.3d 907, 918 (Mo. Ct. App. 2004) ("The trier of fact normally decides causation, especially where reasonable minds could differ as to causation on the facts of the case."). Summary judgment is inappropriate on this claim.

## XI.  CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that the motion of defendant American Business Brokers, Inc. to exclude expert witness Kevin Short (Doc. 72) is granted in part, and otherwise denied.

**IT IS FURTHER ORDERED** that the motion of defendant American Business Brokers, Inc. for summary judgment (Doc. 74) is denied in its entirety.

**IT IS FURTHER ORDERED** that the motion of plaintiff Ayers Oil Co. and third-party defendants Robert and Steve Ayers to exclude the expert testimony of Paul Surls (Doc. 76) is granted in part, and otherwise denied.

**IT IS FURTHER ORDERED** that the motion of plaintiff Ayers Oil Co. and third-party defendants Robert and Steve Ayers for summary judgment (Doc. 78) is granted in part, and otherwise denied. Count I of ABB's third-party complaint is dismissed with prejudice. All other claims remain for trial. None of the parties are dismissed.

**IT IS FURTHER ORDERED** that not later than **August 17, 2010**, the parties shall file a joint proposed trial date for this action. A scheduling conference of the court with counsel for all parties is set for **August 20, 2010 at 2:00 p.m.**


        /S/    David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on July 27, 2010.